UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
RICHARD CLARK WILLIAMSON and
TONYA GALE WILLIAMSON,
                    Debtors.                    No. 09-15298-s11

**MEMORANDUM OPINION ON DEBTORS'
MOTION FOR SUMMARY JUDGMENT ON OBJECTION
TO CLAIM OF BANK '34 AND BANK 34'S CROSS-MOTION**

This matter is before the Court on Debtors' Objection to

Proof of Claim #9, filed by Bank '34 ("Bank")(doc 102)[1].  Debtors

filed a Motion for Summary Judgment ("Motion") on their claim

objection with a Brief in Support.  Docs 118, 119.  Bank

responded and filed a Cross-Motion for Summary Judgment ("Cross-

Motion").  Doc 120.  Debtors replied and responded.  Doc 121,

amended by 123.  Debtors are represented by their attorney the

Law Office of George Dave Giddens, PC (Christopher M. Gatton and

George D. Giddens, Jr.).  Bank is represented by its attorney

John D. Wheeler & Associates, a Professional Corporation (John D.

Wheeler).  For the reasons set forth below, the Court will deny

Debtors' Motion and grant Bank's Cross-Motion in part.

-------------------

[1]The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§ 1334 and 157(b); this is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B); and
these are findings of fact and conclusions of law as may be
required by Rule 7052 F.R.B.P.

**SUMMARY JUDGMENT**

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Bankruptcy Rule 7056[2]. In

---

[2] Bankruptcy Rule 7056 incorporates Fed.R.Civ.P. 56. That Rule provides, in part:
(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
...
(c) Procedures.
(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
(2) Objection That a Fact Is Not Supported by Admissible evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or
                                    (continued...)

-2-

determining the facts for summary judgment purposes, the Court
may rely on affidavits made with personal knowledge that set
forth specific facts otherwise admissible in evidence and sworn
or certified copies of papers attached to the affidavits.
Fed.R.Civ.P. 56(c)(1).  When a motion for summary judgment is
made and supported by affidavits or other evidence, an adverse
party may not rest upon mere allegations or denials.  <u>Id.</u>
Rather, "Rule 56(e) ... requires the nonmoving party to go beyond
the pleadings and by her own affidavits, or by the 'depositions,
answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for
trial.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).
"Rule 56(e) permits a proper summary judgment motion to be
opposed by any of the kinds of evidentiary materials listed in
Rule 56(c), except the mere pleadings themselves."  <u>Id.</u>  The

---

[2](...continued)
declarant is competent to testify on the matters
stated.
...
(e) Failing to Properly Support or Address a Fact.  If
a party fails to properly support an assertion of fact
or fails to properly address another party's assertion
of fact as required by Rule 56(c), the court may:
(1) give an opportunity to properly support or address
the fact;
(2) consider the fact undisputed for purposes of the
motion;
(3) grant summary judgment if the motion and supporting
materials--including the facts considered
undisputed--show that the movant is entitled to it; or
(4) issue any other appropriate order.

-3-

court does not try the case on competing affidavits or depositions; the court's function is only to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In ruling on a motion for summary judgment, the trial court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. Mountain Highlands, LLC v. Hendricks, 616 F.3d 1167, 1169-70 (10th Cir. 2010)(citing Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005)). On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment." Id. at 1170 (quoting Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)) (internal quotation marks omitted). "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)(citing Celotex, 477 U.S. at 322-23). "[F]ailure of proof of an essential element renders all other facts immaterial." Mountain Highlands, 616 F.3d at 1170 (quoting Koch v. Koch Indus., Inc., 203 F.3d 1202, 1212 (10th

-4-

Cir.), <u>cert. denied</u>, 531 U.S. 926 (2000)).

New Mexico LBR 7056-1 governs summary judgment motions. It provides, in part:

> The memorandum in support of the motion shall set out as its opening a concise statement of all of the material facts as to which movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies.
>
> A memorandum in opposition to the motion shall contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and shall state the number of the movant's fact that is disputed. All material facts set forth in movant's statement that are properly supported shall be deemed admitted unless specifically controverted.

**<u>FACTS</u>**

Debtors' Memorandum in Support of Motion for Summary Judgment (doc 119) contains a statement of 13 proposed undisputed facts. Bank's Cross-Motion for Summary Judgment (doc 120) contains a statement of five additional proposed undisputed facts, numbered 14 to 18. Bank admitted that Debtors' proposed facts 1 through 10 and 12 were undisputed. Bank's problems with facts 11 and 13 are discussed in connection with those facts below. The Court finds the following facts proposed by the Debtors to be undisputed:

1. Debtors filed a voluntary petition for relief under chapter 12 of the Bankruptcy Code on November 19, 2009 (doc 1). The case

-5-

was subsequently converted to one under chapter 11 on August 13, 2010 (doc 70).

2. Bank filed its Proof of Claim (the "Claim") in the amount of $1,509,644.85 on March 4, 2010. Claim 9.

3. The Claim included four (4) loans as evidenced on the "Proof of Claim Documentation Summary" filed as page 2 of the Proof of Claim. However, the Claim did not provide the balance for each individual loan included. Claim 9-1 part 2.

4. Loan No. 1563, included in Claim 9, was satisfied in full by New Mexico Building Co., Inc., the primary borrower on the loan, after the petition date. Claims 9-1 through 9-5, Affidavit of Tonya Gayle Williamson[3].

5. Claim 9 states that it is a secured Claim. Claim 9-1.

6. The Debtors contested the inclusion of Loan No. 1563 and the "secured" status of the personal guarantees of Loan No. 1628, and filed the Debtors' Objection to Proof of Claim 9 filed by Bank on September 29, 2010. (Doc 102.)

7. On October 14, 2010, Bank amended Claim 9 by filing individual proofs of claim for Loan No. 2415 (Claim 9-2), Loan No. 2466 (Claim 9-3), and Loan No. 1628 (Claims 9-4 and 5). The Bank did not file an amended proof of claim for Loan No. 1563, acknowledging that the Debtors are no longer obligated personally for repayment of the loan. Claims 9-1 through 9-5.

_____

[3]Attached to Debtors' Memorandum as Exhibit A. (Doc 119).

-6-

8.   The original claim and all of the amended claims were filed as "secured claims."  Claims 9-1 through 9-5.

9.   Bank did not attach the most recent documents evidencing the Debtors' guarantees[4], dated March 5, 2009, to Claim 9-1. However, these documents were attached to Claim 9-5.

10.  The March 5, 2009 Personal Guarantee documents signed by the Debtors clearly indicate that the guarantees, when read alone, are unsecured.  Claim 9-5, Exhibits A and B.

11.  Debtors' Proposed Fact 11 states: "Loan No. 2415[5] contains a "dragnet provision," which states that secured debt for that loan includes but is not limited to:

>      a.   All future advances, or other future obligations
>      from the Debtors to Bank '34 under any promissory note,
>      contract, or guaranty (Exhibit C, ¶4B).
>      b.   All obligations the Debtors owe to Bank '34, which
>      now exist or may later arise (Exhibit C, ¶4C).
>      c.   The Debtors' performance under the terms of any
>      instrument evidencing a debt to Bank, '34 (Exhibit C,
>      ¶4E)."

Bank objects to this fact as follows: "To the extent that Debtors' description of 'Loan No. 2415' is, in fact, describing the 'Line of Credit Mortgage,' dated August 2, 2007, Bank admits" fact 11.  Exhibit C is not Loan No. 2415, which should presumably be a note.  Rather, Exhibit C is a line of credit mortgage dated August 2, 2007.  The Court has reviewed the Bank's eight proofs

---

[4]Attached to Debtors' Memorandum as Exhibit B.  (Doc 119).

[5]Attached to Debtors' Memorandum as Exhibit C.  (Doc 119).

-7-

of claim filed in this case[6] and finds only one line of credit mortgage executed by the Debtors personally.  That mortgage was executed on August 2, 2007 by both Debtors, individually, on property located at 32 Ivy Lane and was described by legal description attached to the mortgage.  The mortgage was filed for record in Otero County, New Mexico on August 2, 2007.  The mortgage lists a maximum liability of $498,000.00.  This mortgage appears as part of the documentation of loan no. 2415 in Claim 9-1.6, at pp. 8-14 and again as documentation of loan no. 2415 in Claim 9-2, pp. 10-16.  It also appears as part of the documentation of loan no. 1628 at Claim 9-5.2, at pp. 12-18.  It also appears as Exhibit C to Debtors' Motion for Summary Judgment (doc 119-3, pp. 1-7), and as Exhibit A to Bank's Cross-Motion for Summary Judgment (doc 120-1, pp. 1-7).  No copies of this mortgage in the file contain a reference to a loan number.

The Court finds that the Debtors did execute a line of credit mortgage on August 2, 2007 that contains the language stated.  The Court makes no finding as to which loan number the mortgage relates.  And, the Court finds that the promissory note referred to in the mortgage that was executed on August 2, 2007 does not appear in the file.

---

[6]The table at the end of this Memorandum analyzes and summarizes all documents attached to each of the claims.

-8-

12.  Based on these provisions, Bank asserts that the Personal
Guarantees are secured debts.  Claims 9-1 and 9-5.

13.  Debtors' Proposed Fact 13 states: "Although the amendments
[to Bank's proofs of claim] resolve the issue relating to the
inclusion of Loan No. 1563, the Debtors still object to Claim 9
and its amendments, which claim that Loan 1628 is classified as a
secured debt, and hereby renews that objection."

        Bank objects to this fact as follows: "Paragraph 13 ...
contains legal arguments and conclusions, but to the extent that
Paragraph 13 alleges certain facts, Bank denies [them]."  In a
footnote Bank refers to Debtors' Schedule D that listed Bank as
secured and undisputed and that Schedule F did not list any
unsecured debts to Bank.

        The Court finds fact 13 to be: "Debtors still object that
Loan 1628 is classified as a secured debt on the proofs of
claim."  Bank need not respond.

        The Court finds the following facts proposed by Bank to be
undisputed:

14.  Over a period of a number of years, Debtors and Creditor
Bank have routinely entered into and maintained several business
and personal lending and banking activities, involving numerous
pieces of real property and chattel.

15.  The "Line of Credit Mortgage (With Future Advance Clause)"
(hereinafter "Mortgage"), entered into on August 7, 2007, by the

-9-

parties, was intended to secure monies lent for business purposes[7].

16. Bank's Proposed Fact 16 states: "As evidenced by their signatures, and pursuant to the plain language of the Mortgage—both by its use as a line of credit securitization and through its cross-collateralization clause— Debtors intended the Mortgage to secure all Debtors' future obligations in favor of Creditor Bank, including guarantees, and regardless of whether the Mortgage was expressly described in any such future obligation instrument." Debtors object to this fact as follows: "Debtors deny the allegation in paragraph 16 of the Response that the Debtors' intent can be inferred from their signature on the document." This is basically a legal argument, with which the Court agrees in part. The fact is also ambiguous because it fails to differentiate between the concepts of the Debtors' actual intent as opposed to the intent to be divined from the language in the document. And, it is not clear that Bank has a reasonable foundation to know what the Debtors intent was. The Court rejects Bank fact 16. Finally, the document speaks for itself.

---

[7]In Debtors' First Amended Reply (doc 123), Debtors state: "Debtors admit that an August 2007 Line of Credit Mortgage was signed by the Debtors, granting a mortgage to Alamo Federal Savings and Loan." Debtors failed to respond to "was intended to secure monies lent for business purposes" and therefore this fact is deemed admitted by NM LBR 7056-1.

-10-

17.  The personal guarantees, entered into by each individual Debtor on March 5, 2009, in favor of Creditor Bank (hereinafter "Guarantees"), were intended to guarantee monies that were lent to Debtors for business purposes.

18.  Bank's Proposed Fact 18 states: "As evidenced by their signatures, and pursuant to the plain language of the Guarantees, contained in the Guarantees' additional provisions, Debtors intended the Guarantees to be in addition to, and cumulative with, all other debts, past or present, incurred by Debtors in favor of Creditor Bank."  Debtors object to this fact for essentially the same reason as Fact 16.  The Court similarly rejects Fact 18.  And, finally, the document speaks for itself.

**DISCUSSION**

The sole issue presented in this case is the secured status of Debtors' personal guarantee of Loan No. 1628.  This involves discussing several subissues: 1) what is the New Mexico law regarding dragnet clauses, 2) what were the circumstances surrounding the mortgage and what is the nexus of that mortgage to the guarantees, 3) whether the documents involved in this case are unambiguous such that intent of the parties is easily determined by reference to the documents, 4) if the dragnet clause in this case is valid, what are any limitations on the scope of the debts secured.

**NEW MEXICO LAW**

-11-

A "dragnet clause" is a provision in a mortgage that states that the mortgage will secure not only the debt incurred in the instant mortgage transaction, but in addition all other debts or obligations that are presently owed or may in the future be owed to the mortgagee by the mortgagor.  Restatement (Third) of Property § 2.4 (Mortgages Securing Future Advances Not Specifically Described), cmt.

> Dragnet clauses which purport to secure all debts,
> past, present, and future, between parties to a
> security agreement generally are disfavored and thus
> strictly construed.  Uransky v. First Federal Savings &
> Loan Association, [684 F.2d 750 (11th Cir. 1982)].
> Aside from the actual language of the provision,
> construction should focus on the intent of the parties
> as evidenced by the circumstances surrounding the
> mortgage and the nexus between the mortgage and the
> notes involved.  In re Bass, 44 B.R. 113 (Bkrtcy. D.
> N.M. 1984).

Ruidoso State Bank v. Castle, 105 N.M. 158, 160, 730 P.2d 461, 463 (1986).  The hesitation to apply these clauses is evidenced in the "Kansas-Hawaiian rule" mentioned in In re Davis, 44 B.R. 88, 90 (Bankr. D. N.M. 1984):

> ... in the absence of clear, supportive evidence of a
> contrary intention a mortgage containing a dragnet type
> clause will not be extended to cover future advances
> unless the advances are of the same kind and quality or
> relate to the same transaction or series of
> transactions as the principal obligation secured or
> unless the document evidencing the subsequent advance
> refers to the mortgage as providing security
> therefor....

(citing Emporia State Bank and Trust Company v. Mounkes, 214 Kan. 178, 519 P.2d 618 (1974) and Akamine & Sons, Ltd. v. American

-12-

Security Bank, 50 Haw. 304, 440 P.2d 262 (1968).)  The Davis

court rejected this rule, however, finding that "New Mexico had

previously given a rather expansive meaning to open-end mortgage

provisions for future advances."  Id.

     In 1978 the New Mexico Supreme Court decided New Mexico Bank

and Trust Co. v. Lucas Bros., 92 N.M. 2, 582 P.2d 379 (1978).

The court adopted the reasoning behind New Mexico's 1975

enactment of § 61-7-9 (NMSA 1953)(Supp. 1975)[8].  Id. at 4, 582

P.2d at 381.  This statute provides:

> **§ 48-7-9. Mortgages; future advances; lien**.
> Every mortgage or other instrument securing a loan upon
> real estate and constituting a lien, or the full
> equivalent thereof, upon the real estate securing such
> loan, may secure future advances and the lien of such
> mortgage shall attach upon its execution and have
> priority from the time of recording as to all advances,
> whether obligatory or discretionary, made thereunder
> until such mortgage is released of record; provided,
> that the lien of such mortgage shall not exceed at any
> one time the maximum amount stated in the mortgage.

     In Lucas Bros. a junior mortgagee argued that the dragnet

clause should not apply to loans made after the mortgage that

contained the dragnet clause because those later loans were

unrelated to the purpose of the mortgage loan.  Id.  The court

rejected this argument without discussion, finding that the

mortgage was valid and its dragnet clause should be enforced as

written.  Id at 5, 582 P.2d at 382.  The court also reasoned that

the importance of dragnet clauses was "well recognized".  Id. at

---

[8]Currently codified as § 48-7-9 (NMSA 1978).

4, 582 P.2d at 381.  And finally, the court commented that the recording statutes would prevent any harm to future lenders because the upper limits of the secured financing must be stated. Id.

The New Mexico Supreme Court next addressed dragnet clauses in Clovis Natl. Bank v. Harmon, 102 N.M. 166, 692 P.2d 1315 (1985).  That court found that the mortgage (with a dragnet clause) "clearly expresses the intent that it secured all of Harmon's existing or future debt."  Id. at 169, 692 P.2d at 1318. It also found that the trial court's findings were based on substantial evidence.  The court did not address whether the later transactions were similar to the original obligation.  Id. at 168, 692 P.2d at 1317.

The next year, the New Mexico Supreme Court clarified its holding in Harmon in Ruidoso State Bank v. Castle, 105 N.M. 158, 730 P.2d 461 (1986).  It stated that Harmon did not stand for the proposition that dragnet clauses secure all debts "as a matter of law."  Id. at 160, 730 P.2d at 463.  Instead, it ruled that dragnet clauses should be enforced if the "intent of the parties as evidenced by the circumstances surrounding the mortgage and the nexus between the mortgage and the notes involved" suggested an intent to secure future debts.  Id.  It then distinguished Harmon by stating that in Harmon all the court had done was to conclude that the trial judge's ruling that the dragnet clause

-14-

secured other debts was supported by substantial evidence.  Id.
In contrast, the Castle trial judge's findings that the bank
never actually intended the dragnet clause to secure pre-existing
debts that had no nexus to the loan secured by the dragnet
mortgage was supported by substantial evidence.  Id.

Therefore, the lesson from Harmon and Castle is that dragnet
clauses are enforceable, but not automatically.  The crucial
factor is based on the parties' intent as evidenced by the
circumstances[9] surrounding the mortgage and the nexus of that
mortgage to the debts it purports to secure.

There are also two District of New Mexico bankruptcy cases
that discuss dragnet clauses under state law, both decided in
November, 1984.  In the first, In re Davis, 44 B.R. 88, 90
(Bankr. D. N.M. 1984) the court rejected application of the
Kansas-Hawaiian rule as discussed above.  Instead, it simply read
the state statute and found that the mortgage met the
requirements: it was a loan on real property; it had not been
released; it stated the upper limit of advances; and the advances
had not exceeded the stated limit.  Id.  The court also ruled
that the fact that the loan did not make reference to the earlier
mortgage that contained the dragnet clause was not sufficient to
constitute a waiver of that provision.  Id.  That ruling was

_____

[9]As discussed below, "circumstances" do not include a
party's secret intentions.

based solely on the statute, which the Court found had no requirement that subsequent notes make reference to the previous mortgage.  Id.  The court next reasoned:

> Third, in the circumstances of this case we see no reason to conclude that the parties did not intend the mortgage provision to operate as written.  It is difficult to see any merit in the trustee's and KCL's argument.  The language of the mortgage makes it clear that the parties intended to secure the "payment of all loans, advances, indebtedness or liabilities, whether now existing or which hereafter come into existence ... however acquired by the mortgagee, due the mortgagee from the mortgagor ...."  Further, the parties arrived at a figure of $78,000.00 as an upper limit to the lien of the mortgage.  Absent such specific language the New Mexico law might require that the subsequent notes reference the mortgage or that the advances be of the "same class" as the primary obligation so that intent to include future advances could be inferred.  However, here there is no need to "infer" the intent of the parties since that intent is expressed in clear and unambiguous language.  As stated by the New Mexico Supreme Court in Smith v. Price's Creameries, Div. Etc., 98 N.M. 541, 544, 650 P.2d 825, 828-829 (1982):

>> Failing a showing of ambiguity in a contract, or evidence of fraud, where the parties are otherwise competent and free to make a choice as to the provisions of their contract, it is fundamental that the terms of the contract made by the parties must govern their rights and duties.

>> There is no allegation, nor evidence, of any unfairness or oppressiveness in the relationship between the debtors and the Bank.  In the absence of fraud, misrepresentation or other wrongful acts, "a party who executes and enters into a written contract is presumed to know the terms of the agreement, and to have agreed to each of its provisions...."  Smith, 650 P.2d at 829.  See also, In re Guilmette, 12 B.R. 799 (Bankr. D. R.I. 1981); 11 Am.Jur.2d, Bills and Notes, § 695, 17 Am.Jur.2d, Contracts, § 149.

Id. at 90-91.  And, finally the Court saw nothing in the

-16-

surrounding circumstances that was inconsistent with an intent to secure future advances.  Id. at 91.  It also stated that consideration may not be given to the statements of either party as to their subjective intent.  Id. (citing First National Bank of Dallas v. Rozelle, 493 F.2d 1196 (10th Cir.1974) and Restatement of the Law, Contracts, § 230.)

In In re Bass, 44 B.R. 113 (Bankr. D. N.M. 1984) the bankruptcy court was faced with a dragnet clause that the bank claimed secured both a pre-mortgage loan and two post-mortgage loans.  It looked to the circumstances surrounding the mortgage and the relationships of the notes to the mortgage and found that for the pre-mortgage loan, the mortgage could easily have made reference to it but did not.  Also, the pre-mortgage note was for business purposes but the mortgage itself was a personal obligation secured by the Bass residence.  From these two facts, the court determined that there was no intent to secure the pre-mortgage note.  Id. at 116.  For the post-mortgage notes, the court reasoned that the validity and enforceability of future advance clauses was a settled issue in New Mexico and saw no reason to conclude that the parties did not intend it to apply to the post-mortgage notes.  Id.  The court also determined that the dragnet clause would be limited to $19,748.24 because that was the stated amount and anything in excess would be deemed

-17-

unsecured[10].  Id.

## CIRCUMSTANCES AND NEXUS

Over a period of a number of years, Debtors and Creditor
Bank have routinely entered into and maintained several business
and personal lending and banking activities, involving numerous
pieces of real property and chattel.  Fact 14.  A portion of the
relationship is demonstrated by the proofs of claim on file with
their accompanying documents, a detailed analysis of which appear
in the table at the end of this memorandum.

In July 2006, New Mexico Building Company ("NMBC") borrowed
$500,000 from Bank under Loan No. 1563.  The stated purpose of
the loan was "Construction."  Richard Williamson was president of
NMBC and executed documents in that capacity: a note and security
agreement, a commercial loan agreement, a line of credit, and
five line of credit mortgages on property owned by NMBC.  Richard
Williamson executed a personal guaranty of Loan No. 1563 to Bank
with an upper limit of $500,000.  There are two boxes on the
guaranty, one to check if the guaranty were "unsecured" and one
to check if it were "secured."  Neither box was checked, but next
to the "secured" box it stated "secured by a mortgage or security
agreement dated 07/27/2006."  Page two of the guaranty, paragraph

---

[10]A later state court case agreed that amounts advanced up
to the stated maximum amount are secured, and anything in excess
of the stated maximum amount are unsecured.  Pioneer Savings &
Trust v. Rue, 109 N.M. 228, 229, 784 P.2d 415, 416 (1989).

-18-

12 stated: "The liability of the Undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the Undersigned to Lender as guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary."  Loan No. 1563 currently has a zero balance, NMBC paid it off postpetition. Fact 4.

In September 2006, Williamson Construction, Inc. ("WC") borrowed $936,953 from Bank under Loan No. 1628.  The stated purpose of the loan was "Construction."  Tonya Williamson was president and executed documents in that capacity: a note and security agreement, a commercial loan agreement, and a line of credit mortgage on four tracts of real estate in Alamogordo, New Mexico owned by WC.  Both Tonya Williamson and Richard Williamson executed personal guaranties of Loan No. 1628 to Bank with an upper limit of $936,953.00.  There are two boxes on the guaranties, one to check if the guaranty was "unsecured" and one to check if it was "secured."  Neither box was checked, but next to the "secured" box it stated "secured by a mortgage or security agreement dated 09/22/2006."  Page two of each guaranty, paragraph 12 stated: "The liability of the Undersigned under this guaranty is in addition to and shall be cumulative with all other liabilities of the Undersigned to Lender as guarantor or

otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary."

On August 2, 2007, Richard and Tonya Williamson, as individuals, executed a line of credit mortgage (with future advance clause) to Bank. The mortgage is on property described in a metes and bounds description attached to the mortgage and it states the property is located at 32 Ivy Lane, La Luz, New Mexico 88337. The mortgage states that it will have a maximum obligation of $498,000.00. The mortgage defines SECURED DEBT as including, but not limited to, the following:

> A. The promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt): A Promissory Note dated 08/02/2007.
> B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt ,existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt.
> C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
> D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the highest rate in effect, from time to time, as provided in the Evidence of Debt.
> E. Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.

-20-

> If more than one person signs this Mortgage as
> Mortgagor, each Mortgagor agrees that this Mortgage
> will secure all future advances and future obligations
> described above that are given to or incurred by anyone
> or more Mortgagor, or anyone or more Mortgagor and
> others.

The promissory note dated 08/02/2007 does not appear in the file.
The mortgage also provides that: "This Mortgage is complete and
fully integrated. This Mortgage may not be amended or modified
by oral agreement."

On June 27, 2008 Richard and Tonya Williamson executed a
note personally to Bank for $277,500. (Loan No. 2415.) The
stated purpose of the note was "Working Capital." The note
listed collateral of "32 Ivy Lane La Luz NM 88337." The note
further stated that the property will be used for a business. It
further stated "This agreement secures this note and any other
debts I have with you, now or later." On the same date, and in
connection with Loan No. 2415, the Williamsons executed a
commercial loan agreement stating that it was for "business
purposes." They also executed a line of credit agreement
referencing Loan No. 2415, with a maximum credit amount of
$277,500.00, and related documents of "security agreement dated
6/27/2008 and mortgage dated 6/27/2008." Neither the 6/27/2008
security agreement or the 6/27/2008 mortgage appear in the
record.

On August 21, 2008 Richard and Tonya Williamson executed a
note personally to Bank for $100,000. (Loan No. 2466.) The

stated purpose of the note was "Working Capital."  The note
listed collateral of: accounts and other rights to payment,
inventory, equipment, general intangibles, farm products and
supplies, government payments and programs, investment property
and deposit accounts.  It further stated "This agreement secures
this note and any other debts I have with you, now or later."
On the same date, and in connection with Loan No. 2466, the
Williamsons executed a commercial loan agreement stating that it
was for "business purposes."  They also executed a line of
credit agreement, with a maximum credit amount of $100,000.00,
referencing Loan No. 2466 and related documents of "security
agreement dated 08/21/2008 and **mortgage dated 08/02/2007."**
(Emphasis added.)

On March 5, 2009, WC refinanced and renewed Loan No. 1628 in
the amount of $760,000.00.  The stated purpose was "Refinancing."
A note and commercial loan agreement were executed in connection
therewith by Tonya Williamson, President.  The note states that
it was secured by a line of credit mortgage dated 9-22-2006
between WC and Bank and a line of credit mortgage dated 4-29-08
between WC and Bank.

On March 5, 2009, both Richard Williamson and Tonya
Williamson executed new guaranties to Bank of all WC's debts.
Each guaranty states:

> [T]he Undersigned guarantees to Lender the payment and
> performance of each and every debt, liability and

-22-

> obligation of every type and description which Borrower
> [WC] may now or at any time hereafter owe to Lender
> (whether such debt, liability or obligation now exists
> or is hereafter created or incurred, and whether it is
> or may be direct or indirect, due or to become due,
> absolute or contingent, primary or secondary,
> liquidated or unliquidated, or joint, several, or joint
> and several; all such debts, liabilities and
> obligations being hereinafter collectively referred to
> as the "Indebtedness"). Without limitation, this
> guaranty includes the following described debt(s): All
> Debt.

There are two boxes on the guaranties, one to check if the

guaranty were "unsecured" and one to check if it were "secured."

The "unsecured" box was checked. Page two of each guaranty,

paragraph 12 stated: "The liability of the Undersigned under this

guaranty is in addition to and shall be cumulative with all other

liabilities of the Undersigned to Lender as guarantor or

otherwise, without any limitation as to amount, unless the

instrument or agreement evidencing or creating such other

liability specifically provides to the contrary."

In addition to the eight proofs of claims with exhibits the

record contains the affidavit of Tonya Williamson (doc 119-1, pp.

1-4) and the affidavit of Jill Gutierrez, President of Bank's Las

Cruces Division (doc 120-3, pp. 1-4). These affidavits provide

more facts concerning the relationship of the parties and the

circumstances surrounding execution of the documents.

Debtor's affidavit discloses another loan from Bank to WC to

purchase more land for the subdivision WC was developing. In

2009 the subdivision appraised for $894,000. This value was less

-23-

than Bank required to maintain Bank's loan to value ratio.
Therefore, Bank demanded a principal payment of $74,313.41, which
was made.  Bank at this time also obtained the new personal
guarantees that changed the maximum liability from $936,953, <u>see</u>
Claim 9-1.3, pp. 7-10) to "unlimited," <u>see</u> Claim 9-5.2, pp. 7-
10).  The Court finds it significant that Debtor's affidavit
makes no mention of the August 2, 2007 line of credit mortgage.
If Debtors had any facts that would support some theory that the
language of the mortgage, particularly paragraphs 4(B) and
4(C)[11], do not mean what they say, this would have been the place
to list them.

Jill Gutierrez's affidavit, paragraph 12, states that the
Debtors never discussed with the Bank or otherwise expressed an
intent to preclude application of the August 2, 2007 mortgage's
cross-collateralization clause to the March 5, 2009 guarantees.
And, in paragraph 16 she states that Bank, as part of its
decision to continue to lend money to Debtors and their

---

[11]Paragraphs 4(B) and 4(C) are parts of the dragnet clause
that state that the debt secured by the mortgage includes:
    B.  All future advances from Lender to Mortgagor or
    other future obligations of Mortgagor to Lender under
    any, among others, guaranty now existing or executed
    after the mortgage, whether or not this mortgage is
    specifically referred to in the evidence of the debt.
    C.  All obligations Mortgagor owes to Lender, which now
    exist of may later arise....
But the Court finds it even more significant that Debtor's
affidavit paragraph 16 states that the Debtors' intent in signing
the May [sic: March] 5, 2009 guarantees was that they would be
unsecured, in plain contradiction to the August 2, 2007 mortgage.

-24-

businesses, always expected to be able to apply the August 2, 2007 mortgage's clear language.

The Court finds that Debtors and Bank had an extensive history of transactions. Debtors were involved with two corporations and personally guaranteed the corporate debts of both. The record also shows that the Debtors personally borrowed from Bank (at least) twice. But, the two personal loans that are documented in the file both stated that they were for "business purposes" and "working capital." This suggests to the Court that Debtors were willing to obligate themselves and their assets for the benefit of their businesses. In addition, the refinance documents for Loan No. 2466 specifically refer to the August 2, 2007 mortgage on 32 Ivy Lane as collateral.

Therefore, the Court also finds that both the history of the parties and the circumstances of the line of credit mortgage on 32 Ivy Lane suggest that the Debtors intended to, and in fact did, pledge that property as collateral for business loans, existing and future. <u>See</u> Fact 15 ("The 'Line of Credit Mortgage (With Future Advance Clause)' (hereinafter 'Mortgage'), entered into on August 7, 2007, by the parties, was intended to secure monies lent for business purposes.") The language from all the documents also suggests that the Bank intended to create liens on as much property as possible belonging to the Williamsons, NMBC and WC to protect its positions.

-25-

**AMBIGUITY**

As noted by the bankruptcy court in the <u>Davis</u> case: 1) if a contract is not ambiguous, and 2) if there are no allegations of fraud, and 3) if a party is competent and free to make choices as to the provisions of a contract, 4) then the terms of the contract must govern the parties' rights and duties.  <u>Davis</u>, 44 B.R. at 91 (quoting <u>Smith v. Price's Creameries</u>, 98 N.M. 541, 544, 650 P.2d 825, 828-29 (1992)).  Probably in response to Tonya Williamson's affidavit[12] Bank argues in its Cross-Motion that the guarantees are unambiguous.  A guarantee is a contract, and the issue of ambiguity is well developed by New Mexico contract law.

Before construing the contract, the Court will address New Mexico's version of the parol evidence rule.  New Mexico law formerly followed the traditional "four-corners" standard, under which extrinsic evidence was not admissible to vary or modify clear and unambiguous written terms of a contract.  <u>See, e.g.,</u> <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991).  However, in C.R. Anthony, the New Mexico Supreme Court abandoned the four-corners standard:

We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade,

---

[12]Paragraphs 7 and 8 of Ms. Williamson's affidavit state that both the Debtors' and Bank's intent in obtaining the 2006 guarantees was that they would be unsecured.  Paragraph 16 of the affidavit states that Debtors' intent in signing the May [sic, March] 2009 guarantees was that they should be unsecured guarantees.  Doc 119-1, pp. 2-3.

-26-

course of dealing, and course of performance.
See, e.g., Eskimo Pie Corp. v. Whitelawn Dairies,
284 F.Supp. 987, 995 (S.D.N.Y.1968).  New Mexico
case law to the contrary is hereby overruled.

Id. at 508-09, 817 P.2d at 242-243. (Footnotes
omitted.)

The Supreme Court revisited the parol evidence
rule in Mark V, Inc. v. Mellekas, 114 N.M. 778, 781,
845 P.2d 1232, 1235 (1993) when it commented on C.R.
Anthony's implications:

New Mexico law, then, allows the court to consider
extrinsic evidence to make a preliminary finding
on the question of ambiguity.  The present law in
this state concerning the interpretation of
ambiguous or unclear language in written
agreements may be summarized as follows: An
ambiguity exists in an agreement when the parties'
expressions of mutual assent lack clarity.  C.R.
Anthony, 112 N.M. at 509 n. 2, 817 P.2d at 243 n.
2.  The question whether an agreement contains an
ambiguity is a matter of law to be decided by the
trial court.  Levenson v. Mobley, 106 N.M. 399,
401, 744 P.2d 174, 176 (1987).  The court may
consider collateral evidence of the circumstances
surrounding the execution of the agreement in
determining whether the language of the agreement
is unclear.  C.R. Anthony, 112 N.M. at 508-09, 817
P.2d at 242-43.  If the evidence presented is so
plain that no reasonable person could hold any way
but one, then the court may interpret the meaning
as a matter of law.  Id. at 510, 817 P.2d at 244.
If the court determines that the contract is
reasonably and fairly susceptible of different
constructions, an ambiguity exists.  Vickers v.
North Am. Land Dev., Inc., 94 N.M. 65, 68, 607
P.2d 603, 606 (1980).

In 2005, the New Mexico Court of Appeals dealt
with the parol evidence rule in City of Sunland Park v.
Harris News, Inc., 138 N.M. 588, 593, 124 P.3d 566, 571
(Ct.App. 2005), where it discussed the framework for
analyzing admissibility of parol evidence:

{13} There are two levels to analyzing when parol
evidence may be used. Initially, we assess whether

-27-

an ambiguity exists in the contract language.  The
district court may hear extrinsic evidence to
answer this preliminary question.  Mem'l Med.
Ctr., Inc. v. Tatsch Constr., Inc., 2000-NMSC-030,
¶ 16, 129 N.M. 677, 12 P.3d 431.  If the district
court determines that the contract is not
ambiguous, it need not admit the extrinsic
evidence to aid it in its interpretation.  Id.  On
the other hand, if the district court decides that
a term is ambiguous, it may admit extrinsic
evidence to explain what the parties meant the
term to mean.  C.R. Anthony Co. v. Loretto Mall
Partners, 112 N.M. 504, 508, 817 P.2d 238, 242
(1991).  Since its conclusion of ambiguity or lack
of ambiguity is also a ruling on whether extrinsic
evidence may or may not be heard, the admission or
exclusion of extrinsic evidence to explain an
ambiguous term is reviewed de novo.  See Mem'l
Med. Ctr., Inc., 2000-NMSC-030, ¶ 18 ("Whether
ambiguity exists is a question of law; therefore,
this Court reviews the district court's decision
to exclude extrinsic evidence de novo.").

In re Faust, 2007 WL 4395695 at *4-5 (Bankr. D. N.M. 2007)

(footnote omitted.)

     Under Bass, 44 B.R. at 116, a note that predates a mortgage

that contains a dragnet clause is probably not secured by the

mortgage unless the mortgage refers to it specifically.

Therefore, arguably Debtors' 9/22/2006 guarantees to Bank would

not be secured.  Debtors argue that if the 2006 guarantees would

not be secured, the 2009 guarantees, which are essentially the

same obligation, should also not be secured.  Debtors cite no

legal authority for this proposition.  The Court, however,

believes that this result does not follow.  The March 2009

guarantees are new contracts with different terms.  They also

came into being after the August 2, 2007 line of credit mortgage

-28-

(with future advance clause).  The Court finds that the 2009 guarantees were different from the 2006 guarantees, and should be analyzed independently of the 2006 guarantees.

Under C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43, this Court may consider collateral evidence of the circumstances surrounding the execution of the line of credit mortgage and the guarantees to determine if the language is unclear.  In the previous section of this Memorandum Opinion the Court examined those circumstances.  With them in mind, the Court now examines if the language of the line of credit mortgage or the guarantees is unclear.

The Court finds that both the line of credit mortgage and the guarantees are clear and unambiguous.  The Court finds the documents are not reasonably and fairly susceptible of different constructions.  The words used show an intention of the Debtors to pledge their land for the secured debt defined in the line of credit mortgage, including the dragnet clause.  The dragnet clause specifies that it will operate to secure future guarantees of debts owed Bank.  The 2009 guarantees make Debtors liable for all debts of WC in an unlimited amount[13].  They are basically form documents with no deletions or additions.  They are legal

---

[13]Debtors repeatedly argue that the "unsecured" box is checked on the 2009 guarantee and Bank should be held to be unsecured.  The Court finds that that box did not need to be checked.  Debtors had already executed, and Bank had filed for record, a mortgage that by law would secure the debts.

-29-

documents with legal terms that a court will presume to have
their normal legal meanings absent a contrary intention appearing
in the instrument. See Levenson v. Mobley, 106 N.M. 399, 403,
744 P.2d 174, 178 (1987). They were entered into in the ordinary
course of business of the parties. Neither party alleges, argues
or states in the affidavits that the language was unclear or that
they disagreed on the terms. The parties do, however, disagree
on the how the terms should be applied to the existing facts.

Debtors make it clear that they did not intend for the
mortgage to extend to the business debts. They also are clear
that they believed the values of the business collateral was more
than the debts and that the issue of the mortgage would not come
up. Therefore, they state that the only collateral would have
been the businesses' assets. Debtors do not allege, however,
that they ever informed Bank of this unspoken intention and
belief. And, Jill Gutierrez's affidavit affirmatively states
that Debtors did not inform bank of this intent or belief.
Debtors' intent in this case is not relevant. See Hoggard v.
City of Carlsbad, 121 N.M. 166, 170, 909 P.2d 726, 730, 1996-
NMCA-003 (Ct.App. 1995),cert. denied, 121 N.M. 119, 908 P.2d 1387
(1996):

> As a matter of law, one party's subjective impressions,
> innermost thoughts, or private intentions, do not
> create an ambiguity. Crawford Chevrolet, Inc. v.
> National Hole-in-One Ass'n, 113 N.M. 519, 522 n. 3, 828
> P.2d 952, 955 n. 3 (1992); Perea v. Snyder, 117 N.M.
> 774, 780, 877 P.2d 580, 586 (Ct.App.) ("[I]t is the

-30-

intention which finds expression in the language used
and not the party's secret or undisclosed intent that
controls."), <u>cert. denied</u>, 118 N.M. 90, 879 P.2d 91
(1994).  Plaintiff cannot establish an ambiguity merely
by attempting "to raise a factual issue as to what was
the intent in his own mind, which ... is not the
issue." <u>Perea</u>, 117 N.M. at 780, 877 P.2d at 586; <u>see
also</u> <u>Hansen v. Ford Motor Co.</u>, 120 N.M. 203, 206, 900
P.2d 952, 955 (1995)(stating that statements of
unilateral, subjective intent are insufficient to
establish ambiguity in light of clear contract
language).  Just because Plaintiff thought he had an
option does not make it so.  Nor does it create an
ambiguity for the jury to resolve.

<u>See also Environmental Control, Inc. v. City of Santa Fe</u>, 131

N.M. 450, 455-56, 38 P.3d 891, 896-97, 2002-NMCA-003, ¶15

(Ct.App. 2001), <u>cert. denied</u>, 131 N.M. 564, 40 P.3d 1008 (2002):

A party's statement of unilateral subjective intent,
without more, is insufficient to establish ambiguity in
light of clear contractual language.  <u>Hansen v. Ford
Motor Co.</u>, 120 N.M. 203, 206, 900 P.2d 952, 955 (1995).
As a matter of law, one party's subjective impressions,
innermost thoughts, or private intentions do not create
ambiguity.  <u>Hoggard v. City of Carlsbad</u>, 1996-NMCA-003,
¶ 15, 121 N.M. 166, 909 P.2d 726; <u>see</u> <u>Montoya v. Villa
Linda Mall, Ltd.</u>, 110 N.M. 128, 129, 793 P.2d 258, 259
(1990) ("It is black letter law that, absent an
ambiguity, a court is bound to interpret and enforce a
contract's clear language and cannot create a new
agreement for the parties."); <u>see also</u> <u>Richardson v.
Farmers Ins. Co.</u>, 112 N.M. 73, 74, 811 P.2d 571, 572
(1991) ("Absent ambiguity, provisions of [a] contract
need only be applied, rather than construed or
interpreted.").

Furthermore, Debtors' arguments and allegations of intent

are not offered to explain the circumstances surrounding the

execution of the documents, but to alter the contracts

themselves.  This they cannot do.  <u>Central Security and Alarm

Co., Inc. v. Mehler</u>, 121 N.M. 840, 853, 918 P.2d 1340, 1353,

-31-

1996-NMCA-060, ¶47.

In summary, the Court finds that the Mortgage and the 2009 Personal Guarantees are not ambiguous. Therefore, the Court may not consider parol evidence to alter the terms of the clear language in the documents. "Absent ambiguity, provisions of [a] contract need only be applied, rather than construed or interpreted." Richardson v. Farmers Ins. Co., 112 N.M. 73, 74, 811 P.2d 571, 572 (1991).

Section 48-7-9 (NMSA 1978) has few requirements for an enforceable dragnet clause: 1) a loan on real property; 2) that has not been released; 3) the mortgage states the upper limit of advances; and 4) the advances have not exceeded the stated limit[14]. There is no requirement for the subsequent obligation to refer to the earlier mortgage that contains the dragnet clause. The line of credit mortgage satisfies these requirements and the 2009 guarantees are therefore secured.

## LIMITATIONS

The line of credit mortgage stated a maximum limit of $498,000. Therefore, Bank's claim for the Debtors' personal guarantee of WC's debts will be limited to $498,000.

---

[14]Or, if the advances have exceeded the stated limit, the advances up to the limit are secured and those in excess are unsecured. Pioneer Savings & Trust v. Rue, 109 N.M. at 229, 784 P.2d at 416.

-32-

**CONCLUSION**

The Court will enter an Order denying Debtors' Motion and granting Bank's Cross-Motion to the extent of $498,000.

Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: October 8, 2011

Copies to:

Christopher M Gatton
Law Office of George Dave Giddens, PC
10400 Academy Rd., #350
Albuquerque, NM 87111

George D Giddens, Jr
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111-1229

John D. Wheeler
PO Box 1810
Alamogordo, NM 88311-0600

-33-

This is a list of abbreviations used in the following table, which details the documents attached to Bank's proofs of claim.

| Abbreviation | Meaning |
| --- | --- |
| LW | Levi Williamson |
| LW-VP | Levi Williamson, as Vice President of New Mexico Building Company, Inc. |
| NMBC | New Mexico Building Company, Inc. |
| RW | Richard Williamson |
| RW-P | Richard Williamson, as President of New Mexico Building Company, Inc |
| TW | Tonya Williamson |
| TW-P | Tonya Williamson, as President of Williamson Construction |
| WC | Williamson Construction |
| n | note and security agreement |
| cla | commercial loan agreement |
| g | guaranty |
| loc | line of credit agreement |
| locm | line of credit mortgage |
| con | Stated purpose of loan was construction |
| work | Stated purpose of loan was working capital |
| bus | Stated purpose of loan was business |
| refi | Stated purpose of loan was refinancing |
| X | Cross collateralized: "This agreement secures this note and any other debts I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts , to make any required disclosure about this security agreement, or if you fail to give any required notice of the right of rescission." |
| I | Integrated: "[All] agreements we reach covering [loan terms] are contained in this writing, which is the complete and exclusive statement of |

-34-

| Abbreviation | Meaning |
|---|---|
|  | the agreement between us." and/or "The Loan Documents are the complete and final expression of the understanding between Borrower and Lender." |
| D | Dragnet provision: The term "Secured Debt" includes, but is not limited to, the following:<br>A.  The promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt): A promissory note dated [_____]<br>B.  All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt.<br>C.  All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for covenants relating to any deposit account agreement between Mortgagor and Lender.<br>D.  All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the highest rate in effect, from time to time, as provided in the Evidence of Debt.<br>E.  Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt. |
| mtg | mortgage |

This table details documents attached to Bank's proofs of claim.

| Date | Doc | Maker | Purpose | Amount | Collat-eral | X I D | Signed by | Location of docs in record | Filed with County? Date. | Maturity date/ Max Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| **#1563** 07/27/06 | n | NMBC | con | $500,000 | 2412 & 2424 Mesa Lane | X | RW-P LW-VP | Claim 9-1.4, pp. 2-4 | Otero 07/27/06 | 07/27/07 |
| 07/27/06 | cla | NMBC | | $500,000 | | X I | RW-P LW-VP | Claim 9-1.4, pp. 5-6 | | |
| 07/27/06 | g of NMBC debt | RW | | | mtg 7/27/06 | | RW | Claim 9-1.4, pp. 7-8 | | $500,000 |
| 07/27/06 | g of NMBC debt | LW | | | mtg 7/27/06 | | LW | Claim 9-1.4, pp. 9-10 | | $500,000 |
| 07/27/06 | loc | NMBC | | $500,000 | | | RW-P LW-VP | Claim 9-1.4, p. 11 | | $500,000 |
| 07/27/06 | locm | NMBC | con | | Lot 4 | D I | RW-P LW-VP | Claim 9-1.4, pp. 12-17 | Otero 09/26/07 | $394,000 |
| 07/27/06 | locm | NMBC | con | | Lot 6 | D I | RW-P LW-VP | Claim 9-1.4, pp. 18-23 | Otero 07/23/07 | $228,000 |
| 07/27/06 | locm | NMBC | con | | Lot 34 | D I | RW-P LW-VP | Claim 9-1.5, pp. 1-6 | Otero 07/13/07 | |
| 07/27/06 | locm | NMBC | con | | Lot 16A | D I | RW-P LW-VP | Claim 9-1.5, pp. 7-12 | Otero 10/31/06 | $232,500 |
| 07/27/06 | locm | NMBC | con | | Lot 15A Lot 17A | D I | RW-P LW-VP | Claim 9-1.5, pp. 13-18 | Otero 07/28/06 | $500,000 |

Debtor's motion for summary judgment states as fact 4 that loan 1563 was paid in full by NMBC after the petition. Bank admits. Therefore, the information regarding #1563 is only relevant to the circumstances of the relationship.

| Date | Doc | Maker | Purpose | Amount | Collateral | X I D | Signed by | Location of docs in record | Filed with County? Date. | Maturity date/ Max Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| **#1628** 09/22/06 | n | WC | con | $936,953 | 4 tracts in Alamogordo | X | TW-P | Claim 9-1.3, pp. 2-4 | Otero 09/27/06 | 09/22/07 |
| 09/22/06 | cla | WC | bus | $936,953 | Mtg | I | TW-P | Claim 9-1.3, pp. 5-6 | | |
| 09/22/06 | **g of WC debt** | TW | | $936,953 | refers to Mtg. 9/22/06 | | TW | Claim 9-1.3, pp. 7-8 | | $936,953 |
| 09/22/06 | **g of WC debt** | RW | | $936,953 | refers to Mtg. 9/22/06 | | RW | Claim 9-1.3, pp. 9-10 | | $936,953 |
| 09/22/06 | locm | WC | con | | 4tracts Alamo. owned by WC | D I | TW-P | Claim 9-1.3, pp. 11-17 | Otero 09/27/06 | $1873906 |
| 03/05/09 | cla | WC | | $760,000 | sec agt 3/5/09 | I | TW-P | Claim 9-5.2, pp. 2-3 | | |
| 03/05/09 | n | WC | refi | $760,000 | locm-WC-9/22/06 & locm-WC-4/29/08 & prop in alamogordo | X | TW-P | Claim 9-5.2, pp. 4-6 | | 3/5/10 |

Claim 9-5 amends the original Claim and is for account 1628 only. Claim is: personal guarantee. It claims to be secured by real estate. Principal $755,965.77. "Secured by mortgages on real property owned by Williamson Construction, Inc. and on property pledged by Debtors individually pursuant to a dragnet or cross-collateralization provision contained in said mortgage. Claim 9-8 amends 9-5 by calculating interest and late fees through 11/10/2010. Principal $755,965.77, accrued interest $76,669.68, late charges $38,765.65 for a total of $871,401.10. Interest at 8.50%. Property value $800,000.00.

–37–

| Date | Doc | Maker | Purpose | Amount | Collat-eral | X I D | Signed by | Location of docs in record | Filed with County? Date. | Maturity date/ Max Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| **#2415** 06/27/08 | n | RW TW | work | $277,500 | 32 Ivy Lane | X | RW TW | Claim 9-1.6, pp. 2-4 & Claim 9-2, pp. 4-6 | | 06/27/09 |
| 06/27/08 | cla | RW TW | bus | $277,500 | | I | RW TW | Claim 9-1.6, pp. 5-6 & claim 9-2, pp. 7-8 | | |
| 06/27/08 | loc | RW TW | | | | | RW TW | Claim 9-1.6, p. 7 & claim 9-2, p.9 | | $277,500 |

Claim 9-2 amends the original Claim and is for account 2415 only.  Claim is: Money loaned.  It claims to be secured by real estate.  Principal $274,415.99, accrued interest $21,205.19, late fees $3,209.16 for a total of $298,830.34.  Claim 9-6 amends 9-2, Principal $274,415.99, accrued interest $32,979.99, late fees $13,8022.19 plus itemized attorney fees (billing attached) of $55,886.28.  Total $377,084.36.  Interest at 8.25%.  Property value $515,000.00.

–38–

| Date | Doc | Maker | Purpose | Amount | Collat-eral | X I D | Signed by | Location of docs in record | Filed with County? Date. | Maturity date/ Max Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| **#2466** 08/21/08 | n | RW TW | work bus | $100,000 | UCC -a/r, accts, inv, equip, intang, farm, gov, invest, deposits | X | RW TW | Claim 9-1.7, pp. 2-4. & Claim 9-3.2, pp. 2-4 | | 08/21/09 |
| 08/21/08 | cla | RW TW | bus | $100,000 | security agr. 08/21/08 | I | RW TW | Claim 9-1.7, pp. 5-6 & Claim 9-3.2, pp. 5-6 | | |
| 08/21/08 | loc | RW TW | | | security agr. 08/21/08 & **mtg. 08/02/07** | | RW TW | Claim 9-1.7, p. 7 & claim 9-3.2 p.7 | | $100,000 |
| Claim 9-3 amends the original Claim and is for account 2466 only. Claim is: Money loaned. It claims to be secured by motor vehicle and "other". Principal $99,040.00, accrued interest $8,941.45 for total of $107,981.45, Claim 9-7 amends 9-3, Principal $99,040.00, accrued interest $8,931.92, late fees $5,080.92 for a total of $113,052.84. Interest at 7.00%. Property value $110,000.00. | | | | | | | | | | |

– 39 –

| Date | Doc | Maker | Purpose | Amount | Collat-eral | XID | Signed by | Location of docs in record | Filed with County? Date. | Maturity date/ Max Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| **# ????** 03/05/09 | **g of WC debt** | RW | | unlimited | "unse-cured" | | RW | Claim 9-5.2, pp. 7-8 | | **unlimited** |
| 03/05/09 | **g of WC debt** | TW | | unlimited | "unse-cured" | | TW | Claim 9-5.2, pp. 9-10 | | **unlimited** |
| These two guarantees do not reference a loan number. | | | | | | | | | | |
| **# ????** 08/02/07 | **locm** | RW TW | | **8/2/07 - not in record** | 32 Ivy Lane | **D I** | RW TW | Claim 9-1.6, pp. 8-14. (loan # 2415) Claim 9-5.2, pp. 12-18 (loan # 1628) & claim 9-2, pp. 10-16 (loan # 2415) | **Otero 08/02/07** | $498,000. |
| This line of credit mortgage does not reference a loan number. | | | | | | | | | | |